IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THOMAS CLAY HARRIS,

        Plaintiff,

        v.                                                   Civil Action No. 2:12-cv-45

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION THAT MR. HARRIS'S MOTION FOR SUMMARY JUDGMENT BE DENIED AND COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT BE GRANTED

### I. INTRODUCTION

**A. Background**

Thomas Clay Harris brought this action under 42 U.S.C. § 1383(c) for judicial for review of the decision of the Commissioner of Social Security that denied his claims for supplemental security income (SSI) under Title XVI, 42 U.S.C. §§ 1381-1383f.[1] Commissioner filed his Answer on August 27, 2012.[2] Mr. Harris filed his Motion for Summary Judgment on October 5, 2012.[3] Commissioner filed his Motion for Summary Judgment on November 5, 2012.[4]

**B. The Pleadings**

---

[1] Dkt. No. 1.

[2] Dkt. No. 10.

[3] Dkt. No. 20.

[4] Dkt. No. 22.

    1. Mr. Harris's Motion for Summary Judgment.

    2. Commissioner's Motion for Summary Judgment & Memorandum in Support.

**C. Recommendation**

I recommend that:

1. Mr. Harris's Motion for Summary Judgment be **DENIED** because: (1) Hallex does not impose a judicially enforceable duty; (2) the vocational expert testified consistent with the manuals; (3) there was no inconsistency between step two and steps four and five of the sequential evaluation process; (4) the Court cannot review decisions to reopen previously adjudicated claims; and (5) the ALJ's 2010 decision was not inconsistent with the 2007 decision.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II. FACTS

**A. Procedural History**

Mr. Harris first applied for SSI and disability insurance benefits in September 2004, alleging disability as of December 2, 2002. That application was denied, and, at Mr. Harris's request, an administrative law judge (ALJ) held a hearing. After an unfavorable decision by the ALJ on April 5, 2007, Mr. Harris appealed to the Appeals Council, which denied his request for review. Mr. Harris did not appeal the unfavorable decision to a federal district court.

Mr. Harris again applied for SSI on April 30, 2007, alleging disability as of December 2, 2002, due to carpal tunnel syndrome, back and leg pain, circulation problems, and eye problems. The Social Security Administration denied the application in the first instance and on

reconsideration. At Mr. Harris's request, an ALJ held hearings on July 1, 2009 and February 4, 2010, at which Mr. Harris, who was represented by counsel, and a vocational expert testified. On April 22, 2010, the ALJ issued a decision finding that Mr. Harris was not disabled under the Act. The Appeals Council denied review, and Mr. Harris filed the instant action against the Commissioner.

**B. Personal History**

Mr. Harris was born on July 27, 1964, making him a younger individual under the meaning of the Act. Mr. Harris received a GED after completing eleven grades of school through regular classroom placement, and has worked in the past as an automotive technician, construction worker, lumber worker, general laborer, and truck driver. (R. 254, 541.) Mr. Harris has one brother, who is deceased, and one sister. He has been married and divorced twice, and has three children that all live with their mother. (R. 398.)

**C. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Mr. Harris is not under a disability and can still perform work in the national economy.[5] Based on the records, Dr. Trenbath has been seeing Mr. Harris for low back pain with radiculopathy since early 2006. On June 13, 2006, Dr. Wilson removed a subcutaneous mass from Mr. Harris's back with no complications. (R. 351.) On November 24, 2006, Mr. Harris had an MRI of the lumbar spine, which noted degenerative disk disease at L1-L2 with mild diffuse disk bulgings and subtle reversed Grade I spondylolisthesis. (R. 343.) On February 5, 2007, Dr. Trenbath saw Mr. Harris for his back pain and noted that a back brace seemed to be "helping quite

---

[5] Because Mr. Harris raises nothing in his argument about his alleged mental illness, this summary will only address the alleged physical impairments.

a bit." (R. 366.) On March 26, 2007, Dr. Trenbath saw Mr. Harris for complaints of back and heel pain, and numbness in his hands. The doctor found probable carpal tunnel syndrome, thickened heels, and chronic low back pain, and issued nerve conduction studies for the carpal tunnel. (R. 361.) A study performed on April 19, 2007 led Dr. Navada to conclude that Mr. Harris had moderate carpal tunnel syndrome bilaterally. (R. 354.)

On July 16, 2007, and July 20, 2007, Mr. Harris was examined at the behest of Disability Determination Services, which, based on the medical records provided, diagnosed degenerative disc disease, Grade I spondylolisthesis, and degenerative arthritis in the left knee. (R. 394.) On July 30, 2007, a physical residual functional capacity assessment was performed, which confirmed the mild disc bulging. However, after complaints of trouble getting up and down from the toilet, the doctor noted that Mr. Harris did not have any trouble getting up and down from the exam table. (R. 423.) A July 18, 2007 report from West Virginia DHHR found that Mr. Harris was unable to work due to his pain. (R. 428-30.)

On a December 19, 2007, visit with Dr. Trenbath, Mr. Harris was found to have his hypertension under control, and was excited about an upcoming surgery to fix the carpal tunnel. (R. 441.) On January 15, 2008, Mr. Harris underwent surgery to decompress the left median nerve. (R. 446.), and at a follow up visit the doctor noted a "little bit of weakness and grip strength that [Mr. Harris] needs to work on to regain," and that his "numbness is getting better." (R. 447.) On March 18, 2008, Mr. Harris underwent surgery to decompress the right median nerve. (479-80.) On June 23, 2008, Dr. Trenbath noted that Mr. Harris was being seen for chronic pain by Dr. Batalla, and that he possibly had fibromyalgia. (R. 524.)

Another disability evaluation performed on October 10, 2008, by the West Virginia DHHR,

4

again found Mr. Harris disabled due to his physical conditions. (R. 482-83.) During the next year, Mr. Harris continued to see Dr. Trenbath for lower back pain, heartburn and reflux, and to refill his medicines. On November 21, 2008, Mr. Harris reported to Dr. Trenbath that he was able to mow his yard, but that it took two days, and that he was having trouble sleeping; the doctor continued his diagnosis of chronic low back pain. (R. 513.)

In October 2009, Mr. Harris had shoulder replacement surgery on his right shoulder. (R. 655-58.) Two months later Dr. Trenbath noted that Mr. Harris was getting more movement in the postoperative shoulder, and that physical therapy was showing some progress. (R. 704.) A report from the physical therapist dated December 16, 2009, showed improvements in flexion, abduction, external and internal rotation in the right shoulder, although the measures were still not on normal levels. (R. 698.) The operating physician noted in late December 2009 that Mr. Harris was "doing fine," and that his "[r]ange of motion is much improved." (R. 702.)

On March 4, 2010, Dr. Trenbath noted that Mr. Harris had limited range of motion in his right arm only, going to about 30 degrees, (R. 746), but that range of motion increased to 75 percent in September 2010. (R. 740.) In June, 2010, Mr. Harris reported during a physical that his shoulder is better, and that he had an improved degree of pain, although he did still complain of low back pain and knee problems. (R. 757.) A review of an X-ray on that same date in June showed "evidence of a well seated shoulder arthroplasty without signs of loosening, malalignment, or displacement," and identified no other abnormalities. (R. 758.)

In November 2010, Dr. Trenbath showed concern with Mr. Harris's pain, and on exam reported that he can only lean forward about 30 degrees, and that a straight leg raising test is positive at about 45 degrees in both legs. (R. 765.) In December 2010, Dr. Trenbath reported that Mr. Harris

5

has "gotten better to some extent" with his neck and shoulder problems. (R. 767.) In February 2011, Mr. Harris reported to Dr. Trenbath that he hurt his right shoulder and right knee, and upon examination the doctor noted that Mr. Harris could only raise his right shoulder 30 degrees. (R. 769.) The doctor gave Mr. Harris a shot in the shoulder, but it reportedly did not help. (R. 774.) Dr. Trenbath continued to see Mr. Harris throughout the duration of 2011 and up to end of the record in early 2012, and reported the same problems–shoulder pain and back pain.

**D. Testimonial Evidence**

There were two hearings in the instant case, one on July 1, 2009 (R. 79-90), and one on February 4, 2010 (R. 45-76.) The following testimony is relevant to the recommendation that follows. At the July 1 hearing, Mr. Harris's attorney made an objection to ALJ Alexander hearing the case because ALJ Alexander presided over the previously adjudicated period that was denied in 2007. ALJ Alexander noted that he would turn that matter over to the Chief Administrative Law Judge. After a discussion about some evidence regarding the previous claim not being in the file, the ALJ concluded the hearing to find those materials.

On February 4, the second hearing was held. Counsel for Mr. Harris started the hearing by asking the ALJ to consider evidence from the previously adjudicated period for alleged changes in conditions or evidence that was not submitted, and again stated the objection to ALJ Alexander hearing the case. The ALJ told counsel to send in the evidence and he would consider it, and that he would proceed with the hearing.

Mr. Harris testified that he had surgery for his carpal tunnel syndrome, which resulted in some improvement, but that he still had numbness and a very weak grip. Further, Mr. Harris testified that if he moved his right shoulder over his head it would fall out of socket, and that he had surgery

6

but he does not feel like it helped. Mr Harris also stated that his left shoulder hurts as well, but not to the extent that his right shoulder does, that his neck and back hurt, and that he has numbness in his legs. Mr. Harris takes pain medication for these symptoms. (R. 54-62.)

Mr. Harris also testified that he has trouble sleeping, but the medication he takes does not work like it is supposed to. Further, Mr. Harris stated that he takes Prozac for depression, Lyrica for fibromyalgia, Piroxicam for arthritis, and medication for blood pressure. Finally, Mr. Harris stated that he does not have the appetite he used to, and that his weight fluctuates from the 250-275 pound range. (R. 62-66.)

The ALJ then examined the vocation expert and proposed the following hypothetical:

> [A]ssume a hypothetical individual of the claimant's age, education background, and work history who would be able to perform a range of light work, would require sit/stand option, could perform postural movements occasionally, except could not climb ladders, ropes or scaffolds, should not do – should not be exposed to temperature extremes, wet or humid conditions or hazards, should do no overhead lifting or reaching, would be limited to low stress work with no production or assembly line type of pace and no independent decision making responsibilities, should do only unskilled work involving only routine and repetitive instructions and tasks, should have no interaction with the general public and no more than occasional interaction with others, any work in the local or national economy that such a person could perform?

(R. 68-69.) The VE responded that this person could perform the job of laundry folder, which has 50,000 positions nationally and 650 regionally, or office assistant, 150,000 nationally and 1,850 regionally. (R. 69.) And if this person was reduced to sedentary work, he could perform the jobs of machine tender, 141,000 nationally and 1,400 regionally, or general sorter, 50,000 nationally and 550 regionally. (R. 69.) On examination by Mr. Harris's counsel, the VE stated that if occasional fingering was included in the RFC that would impact the positions, and if the hypothetical was

7

reduced to any reaching, that person could still perform the work of office assistant. Finally, the VE stated that if the hypothetical person had full discretion to sit/stand and move around, and that if that would take the person off task by more than ten percent, the jobs listed would not be available. (R. 70-72.)

**E. Lifestyle Evidence**

The following evidence concerning Mr. Harris's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Mr. Harris's alleged impairments affect his daily life. Mr. Harris walks to the paper box daily to get the newspaper, and goes to the post office every other day. He is able to drive himself and do his own shopping. Most of the time, Mr. Harris stays in his trailer watching television. (R. 401.)

### III. THE MOTIONS FOR SUMMARY JUDGMENT

**A. Contentions of the Parties**

Mr. Harris contends that there were several errors: first, he claims that the Commissioner violated his due process rights by assigning the case to ALJ Alexander out of rotation; second, he contends that the vocational expert testified inconsistently with the DOT and SCO, without any explanation, and the ALJ's reliance on this testimony is in error; third, Mr. Harris argues that the ALJ's RFCs are inconsistent with his findings at step two of the evaluation process; fourth, that the ALJ failed to consider new and material evidence; and finally, Mr. Harris argues that the ALJ failed to apply SSR ruling AR 00-1(4).

The Commissioner, on the other hand, contends that there was no due process violation, and that the ALJ acted in accord with the Social Security laws, rules, and regulations, and that he based his decision on substantial evidence.

**B. The Standards**

   *1. Summary Judgment*

   Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

   *2. Judicial Review*

   Only a final determination of the Commissioner may receive judicial review. *See* 42 U.S.C. §405(g), (h); *Adams v. Heckler*, 799 F.2d 131, 133 (4th Cir. 1986). Moreover, An ALJ's findings will be upheld if supported by substantial evidence. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence is "not a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), but that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Further, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

*3. Social Security - Medically Determinable Impairment - Burden.*

Mr. Harris bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

**C. DISCUSSION**

*1. The Chief ALJ did not commit reversible error by failing to assign a different ALJ.*

Mr. Harris argues that the ALJ that conducted the hearing and delivered the unfavorable decision that is the subject of the instant action is the same ALJ that conducted his prior hearing that resulted in an unfavorable decision, and that this constitutes a departure from agency procedure and is a violation of due process. In support of his argument, Mr. Harris cites § 3105 of the Administrative Procedure Act, which states that ALJs "shall be assigned to cases in rotation so far as practicable." Further, Mr. Harris cites a rotational rule from the Hearings, Appeals, and Litigation Law Manual (HALLEX), which provides that the "HOCALJ [Hearing Office Chief Administrative Law Judge] generally assigns cases to ALJs from the master docket on a rotational basis . . . unless there is a special situation which requires a change in the order in which a case is assigned." HALLEX I-2-1-55.

Mr. Harris's argument is unavailing for several reasons. First, HALLEX is "an internal Social Security Administration policy manual . . . [that] does not impose judicially enforceable duties on either the ALJ or [the] court." *Lockwood v. Comm'r SSA*, 616 F.3d 1068, 1072 (9th Cir. 2010), *cert. denied by Lockwood v. Astrue*, 131 S. Ct. 2882 (2011); *see also Allen v. Astrue*, No. 5:09cv81, 2010 U.S. Dist. LEXIS 53298, *15 (N.D.W.V. May 28, 2010) (finding same). Because

HALLEX is an agency interpretation that lacks the force of law, this Court cannot force the Commissioner to follow it or provide a remedy to an claimant who avers that the Commissioner did not follow it.

Moroever, HALLEX does not require recusal of an ALJ from hearing separate claims by the same person. HALLEX I-2-1-60 provides that an ALJ "*may* disqualify himself from adjudicating a case if the ALJ believes that his or her participation in the case would give an appearance of impropriety," and that "[i]f an ALJ refuses at the hearing to disqualify himself or herself, the ALJ's explanation in the transcript will be sufficient notice to the claimant." (emphasis added). Here, Mr. Harris raised his objections to ALJ Alexander hearing the successive claim, and the ALJ stated:

> I feel that I can be fair. If I think that Mr. Harris is disabled, I'll pay the case. I don't have any problem with that. So I don't have any real personal interest in the outcome of the case.

(R. 88.) Mr. Harris has failed to prove otherwise; that is, that he was prejudiced by not getting a different ALJ and that the outcome would have been different.

Second, § 3105 of the Administrative Procedures Act does not require a different result. The Supreme Court has held that the "so far as practicable " language in the APA "allows assignments to be determined by more than just the mere mechanical rotation of giving the next case on the docket to the top name on the list of available examiners." *Sykes v. Bowen*, 854 F.2d 284, 288 (8th Cir. 1988) (citing *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 139 (1953)). Factors that are considered in determining any impropriety in going outside the rotation are the complexity of the case, the ability of the ALJ, and any bias that would prevent a fair hearing. *AAACON Auto Transport, Inc., v. I.C.C.*, 792 F.2d 1156, 1163 (D.C. Cir. 1986), *cert. denied*, 481 U.S. 1048 (1987). Mr. Harris has not alleged any bias, or that the ALJ was not competent to hear

his claim for benefits. In fact, Mr. Harris's counsel stated at the hearing that he was objecting solely on procedural grounds. (R. 82, 88.) The APA does not allow such a challenge.

*2. The vocational expert testified consistent with the manuals.*

Mr. Harris contends that the vocational expert listed three jobs that Mr. Harris can perform–general sorter, machine tender, and office assistant–that require frequent or constant reaching, and one–laundry folder–that requires exposure to extreme heat and humidity. This, Mr. Harris argues, is inconsistent with the ALJ's RFC, which concluded that Mr. Harris could not perform work with "exposure to temperature extremes, wet/humid conditions . . . [or] overhead reaching or lifting." (R. 34.)

The Dictionary of Occupational Titles provides that a laundry folder, DOT 369.687-018, has occasional exposure to extreme heat, comprising about one-third of the time on the job, and constant exposure to wet and humid conditions. Using the ALJ's RFC, Mr. Harris clearly could not work in this position. However, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 CFR 416.966(b). Thus, if Mr. Harris is able to perform any one of the other jobs listed then he will not be considered disabled, and the inclusion of laundry folder as a potential occupation is harmless.

Mr. Harris is correct in noting that the three other jobs identified by the vocational expert, office assistant, general sorter, and machine tender, all require either frequent or constant reaching of at least one-third of the time on the job. The question then turns on whether the frequent or constant reaching required by these jobs is a bar to employment based on the ALJ's RFC that Mr. Harris cannot perform *overhead* reaching. However, the two are not equal, and an RFC precluding

12

overhead reaching does not bar employment in a job requiring reaching. *See Byrd v. Apfel*, No. 98-1781, 1998 U.S. App LEXIS 32628, *17 (4th Cir. 1998) (unpublished). Counsel for Mr. Harris seems to admit as much during the hearing before ALJ Alexander:

> Q: And instead of that, I would like for you to assume that our hypothetical individual is restricted, not just from overhead reaching, but is restricted to no more than occasional reaching with the right dominant extremity. And I'm wondering if any of the positions that you've identified would be affected by that restriction?
>
> A: The only one that wouldn't be affected I don't think would be the office assistant.
>
> Q: Okay. And if I restricted or added to the restriction that it would be occasional reaching with either shoulder, would there be any difficulty?
>
> A: It would be the same answer.
>
> Q: Same answer that the office assistant could still be performed. Okay. . . .

(R. 71.) Thus, the ALJ's limitations were clear to the vocational expert, and, according to the expert, even if the RFC was limited to *any* reaching Mr. Harris could still perform the job of office assistant, which has 150,000 positions available nationwide and 1,850 available in the region.[6]

*3. There was no error at step two of the sequential evaluation process.*

Mr. Harris argues that the ALJ found his carpal tunnel syndrome as a severe impairment at step two of the sequential evaluation process, but did not include any manipulative limitations in the RFC to reflect that. Likewise, Mr. Harris argues that the ALJ did not include a severe shoulder impairment at step two, but included a limitation for overhead work in the RFC. Mr. Harris contends that these are not reconcilable.

---

[6] The Court will also not that Mr. Harris noted in his function report that his alleged symptoms do not affect his ability to reach. (R. 291.)

13

However, the existence of limitations found at step two does not necessarily equate to a finding of a disabling RFC because step two and steps four and five require different levels of severity of limitations. *See e.g. Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007); *Farrill v. Astrue*, No. 11-7075, 2012 U.S. App. LEXIS 13222 (10th Cir. 2012) (unpublished); *Hancock v. Astrue*, No. 1:09cv87, 2012 U.S. Dist. LEXIS 52697, *17 n.8 (M.D.N.C. 2012). Step two requires an ALJ to determine whether the medical evidence shows that a claimant's alleged impairments are severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii). This differs significantly from the inquiry at steps four and five, which ask an ALJ to determine what a claimant can still do despite those impairments listed in step two. *See* 20 C.F.R. §§ 404.1520(a)(4), 404.1545(a)(1). Here, the ALJ has done just that and found that Mr. Harris can still do some limited work despite his impairments, and has included additional limitations for impairments that the ALJ did not find severe.

*4. This Court lacks jurisdiction to review the ALJ's decision not to reopen the prior file.*

Mr. Harris argues that the ALJ erred by not reopening a previously adjudicated claim based on new and material evidence to that claim. In *Califano v. Sanders*, the United States Supreme Court held that § 205(g) of the Social Security Act, which provides judicial review of the agency's actions,

> clearly limits judicial review to a particular type of agency action, a "final decision of the Secretary made after a hearing." But a petition to reopen a prior final decision may be denied without a hearing as provided in § 205(b), 42 U.S.C. § 405(b). Indeed, the opportunity to reopen final decisions and any hearing convened to determine the propriety of such action are afforded by the Secretary's regulations and not by the Social Security Act. Moreover, an interpretation that would allow a claimant judicial review simply by filing–and being denied–a petition to reopen his claim would frustrate the congressional purpose, plainly evidenced in § 205(g), to impose a 60-day limitation upon judicial review of the Secretary's final decision on the initial claim for benefits. Congress' determination so to limit judicial review to the original decision denying benefits is a policy choice obviously designed to forestall repetitive or belated

14

> litigation of stale eligibility claims. Our duty, of course, is to respect that choice.

430 U.S. 99, 108 (1977) (internal citations omitted). Thus, this Court cannot entertain Mr. Harris's argument that the ALJ erred by not reopening the previously adjudicated case.

*5. The ALJ did not fail to abide by SSR 00-1(4).*

Plaintiff argues that the ALJ did not properly consider the previous denial of benefits as required by Acquiescence Ruling 00-1(4), and *Albright v. Commissioner*, 174 F.3d 473 (4th Cir. 1999). AR 00-1(4) provides that "an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider . . . a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances." Further, AR 00-1(4) requires the ALJ to consider three criteria when determining the weight applied to a previous decision:

> (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Finally, AR 00-1(4) provides that ALJs should give greater weight to a prior finding that is close in time to the new hearing, and less weight when that claim becomes more remote–longer than three years.

The Court will first note that more than three years has passed between the two decisions, so the prior decision is not entitled to great weight under AR 00-1(4). But the ALJ must still consider the prior finding as evidence in light of all the facts and circumstances in the instant case. The ALJ has done just that, and has issued a decision that is not only consistent with the prior

15

finding but more favorable to Mr. Harris in its limiting of the functions he can perform.[7] Although the ALJ did not specifically mention AR 00-1(4), he mentioned the prior finding, allowed Mr. Harris to submit evidence he thought was new and material, and based his decision on the entire record. The three factor test in AR 00-1(4) presupposes a contradiction between two findings and here there has been none.

## IV. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that:

1. Mr. Harris's Motion for Summary Judgment be **DENIED** because: (1) Hallex does not impose a judicially enforceable duty; (2) the VE testified consistent with the manuals; (3) there was no inconsistency between step two and steps four and five of the sequential evaluation process; (4) the Court cannot review decisions to reopen previously adjudicated claims; and (5) the ALJ's 2010 decision was not inconsistent with the 2007 decision.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

---

[7] The ALJ added the following limitations to the 2010 decision: no exposure to wet and humid conditions; no overhead reaching or lifting; and a limitation to low stress work with no production/assembly line pace, no independent decision making responsibilities, no interactions with the general public, and no more than occasional interaction with coworkers and supervisors. (R. 34, 129.)

DATED: November 30, 2012         /s/ *James E. Seibert*
                                 JAMES E. SEIBERT
                                 UNITED STATES MAGISTRATE JUDGE